## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VICTOR BOGIA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 13-1793-LPS |
| | : | |
| CAROLYN W. COLVIN, Acting | : | |
| Commissioner of Social Security | : | |
| | : | |
| Defendant. | : | |

Gary Linarducci, Esquire, LINARDUCCI & BUTLER, P.A., New Castle, DE

    Attorney for Plaintiff.


Charles M. Oberly, III, United States Attorney, and Heather Benderson, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, DE.

Nora Koch, Acting Regional Chief Counsel, and Lauren D. Chait, Assistant Regional Counsel, SOCIAL SECURITY ADMINISTRATION-REGION III, OFFICE OF GENERAL COUNSEL, Philadelphia, PA.

    Attorneys for Defendant.

## MEMORANDUM OPINION

March 25, 2015
Wilmington, Delaware

*[signature]*

**STARK, U.S. District Judge:**

## I. INTRODUCTION

Plaintiff Victor Bogia ("Bogia" or "Plaintiff") appeals from a decision of Carolyn W. Colvin, the Acting Commissioner of the Social Security Administration ("Commissioner" or "Defendant"), denying his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401-33. The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by Plaintiff and the Commissioner. (D.I. 17; D.I. 19) Plaintiff asks the Court to reverse and remand the Commissioner's decision. (D.I. 18 at 19) The Commissioner requests that the Court affirm her decision denying Plaintiff's application for benefits. (D.I. 20 at 14) For the reasons set forth below, the Court will deny Plaintiff's motion for summary judgment and grant Defendant's motion for summary judgment.

## II. BACKGROUND

### A. Procedural History

Plaintiff filed his claim for DIB and SSI on December 4, 2006, initially alleging disability beginning June 1, 2004. (D.I. 12 (hereinafter, collectively with D.I. 13, "Tr.") at 113) His application for Title II and Title XVI benefits were denied at the pre-hearing levels, and his Title XVI claim was denied upon reconsideration. (*Id.*) He appeared before an Administrative Law Judge ("ALJ") on February 23, 2009; on July 27, 2009, the ALJ issued a decision unfavorable to Plaintiff. (*Id.* at 30-37) Plaintiff filed a subsequent claim for SSI on November 25, 2009, and it was determined that he became disabled beginning November 1, 2009. (*Id.* at 126) The Appeals

Council granted Plaintiff's request for review on March 16, 2011. (*Id.* at 125) The Appeals Council affirmed the finding of disability beginning November 1, 2009, and vacated the ALJ's hearing decision and remanded for the resolution of certain issues. (*Id.* at 125) Following remand, the ALJ held a hearing on February 13, 2012. (*Id.* at 18) The ALJ issued a decision unfavorable to Plaintiff on May 3, 2012. (*Id.* at 30) On September 6, 2013, the Appeals Council denied Plaintiff's request for review. (*Id.* at 2-5) Thus, the May 3, 2012 decision by the ALJ became the final decision of the Commissioner. *See* 20 CFR §§ 404.955, 404.981; *Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On November 1, 2013, Plaintiff filed a complaint seeking judicial review of the ALJ's May 3, 2012 decision. (D.I. 1) Subsequently, on September 24, 2014, Plaintiff moved for summary judgment. (D.I. 17) On October 9, 2014, the Commissioner filed a cross-motion for summary judgment. (D.I. 19)

### B. Factual Background

#### 1. Plaintiff's Medical History, Treatment, and Conditions

Bogia was forty-seven when he first applied for DIB and SSI on December 4, 2006. (Tr. at 210) He completed high school and spent four years studying electrical trades. (*Id.* at 83) He lived with his father and brother at the time of the second hearing. (*Id.* at 56) He worked as an electrician between 1980 and 2004 for various companies. (*Id.*) Bogia alleges that his disability arises from degenerative disc disease with radiculopathy causing back problems, depression, and learning disorders.[1] (*Id.* at 21) His injury originally arose in 2004 after he was assisting his

---

[1] The only medical conditions at issue in Bogia's summary judgment motion are his physical conditions, and, accordingly, the Court will address only Bogia's physical conditions.

father in remodeling his basement, and worsened over time. (D.I. 18 at 2)

Bogia was treated by his general practitioner, Kent Sallee, M.D. (Tr. at 608-30), and several other physicians. These other physicians included: (1) Magdy Boulos, M.D., a neurosurgeon (Tr. at 607, 631-33); (2) Kennedy Yalamanchili, M.D., a neurosurgeon (Tr. at 534-38); (3) multiple providers at Harmonious Mind Psychiatric & Counseling Services ("HMPCS") (Tr. at 492-503); (4) Gary Gerace, Ph.D, a psychologist (Tr. at 699-728); (5) William Medford, Jr., M.D., an otolaryngologist (Tr. at 805); (6) Jie Zhu, M.D., a pain management physician (Tr. at 527-38, 545-91, 761-804, 924-74); and (7) Peter Witherell, M.D., an anaesthesiologist (Tr. at 517-22).

Bogia stopped working in June 2004 due to migraine headaches. (Tr. at 56-57) After Bogia underwent sinus surgery, his headaches went away. (*Id.*) He injured his back in a non-work related accident while digging out a basement at his father's house. (*Id.* at 15) Bogia felt a pop in his back, which turned out to be the rupturing of his disc at L5-S1. (*Id.* at 55, 414, 469) Bogia did not seek treatment for some time due to a lack of insurance and financial means. (*Id.* at 58, 529) Bogia's physicians first attempted to address his symptoms with cortisone shots, epidural injections, steroid blocks, physical therapy, and medications. (*Id.* at 369, 381, 410, 416, 423, 451, 529) These treatments did not give relief from Bogia's symptoms, however, and his treating physicians found that his symptoms were worsening over time. (*Id.* at 469)

Bogia underwent an operation, which included a lumbar hemilanectomy, on June 24, 2008, to alleviate his symptoms. (*Id.* at 469-70) Following the surgery, the pain, which extended across the spine into both his thighs and calfs, and stopping in the region of his heels, did not subside. (*Id.* at 457, 522, 529, 594, 615, 622) Bogia told his physicians that the pain worsened

3

after the surgery. (*Id.* at 492) An MRI on October 14, 2008 showed enhancing scar tissue surrounding the S-1 nerve roots, but no definite spinal cord or nerve root impingement. (*Id.* at 506-07) Testing on November 20, 2008 showed that in spite of the pain, Bogia's motor function was normal. (*Id.* at 520-21) Dr. Witherell noted that the pain was "of unclear etiology." An examination by Dr. Kennedy Yalamanchili on March 11, 2009, for a second opinion, found that surgical treatment "d[id] not appear to be clearly indicated" and "the chance of surgery benefitting [sic] [Bogia] may be more moderate." (*Id.* at 526)

A later examination by Dr. Yalamanchili, on September 9, 2009, found that surgery might be effective for his pain. (*Id.* at 634) Bogia was first prescribed a cane by his physician, and then eventually a wheel walker, on July 17, 2009, and finally a walker with a seat, on October 1, 2009. (*Id.* at 24, 544) A functional capacity evaluation on February 16, 2010, found that Bogia's "movement patterns were inconsistent throughout the testing process and did not correlate with objective findings;" and "Bogia presented with characteristic[s] associated with Inappropriate Illness Behavior and overt symptom exaggeration appears to be present." (*Id.* at 921) The physical therapist who performed the evaluation determined that the results were invalid due to submaximal effort, but also opined that Bogia not be placed in a work environment due to safety issues. (*Id.* at 923) The physical therapist noted that the main issue with Bogia at that time appeared to be insufficient pain management. (*Id.*)

## 2.     The ALJ's Initial Findings and Appeals Council Ruling

In the ALJ's initial decision, she rejected Bogia's claims for SSI and DIB. The ALJ found that Bogia met the insured status requirements through December 31, 2008 and had not engaged in substantial gainful activity since June 1, 2004. (*Id.* at 115) The ALJ found that Bogia

4

had the following severe physical impairments: degenerative disc disease with L5 radiculopathy

and osteoarthritis. (*Id.*)[2] The ALJ found that no impairments met the listed impairments in 20

C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 116) The ALJ further found that Bogia:

> has the residual functional capacity to lift and carry 20 pounds
> occasionally and 10 pounds frequently, stand or walk for 6 hours
> and sit for 6 hours in an 8-hour workday. The claimant can
> frequently push and pull except that he can perform tasks requiring
> only occasional pushing and pulling with his left lower extremity.
> Mr. Bogia can kneel, crawl, crouch, stoop, balance and climb stairs
> occasionally, but he cannot climb ladders, scaffolds or ropes. The
> claimant can perform work activities that allow him to avoid
> exposure to unprotected heights, dangerous machinery, extreme
> heat/cold, vibration, and excessive dust, smoke and gases. The
> claimant can perform routine tasks. He can understand instructions
> and although he may have some difficulty maintaining
> concentration for a full 8 hours a day and 40 hours per week he had
> the ability to maintain concentration and persist in the completion
> of tasks when he puts forth adequate effort.

(*Id.* at 118)

The ALJ explained that Bogia reported chronic and severe back pain, and that medicine

was not relieving this pain. (*Id.* at 118-19) The ALJ found that Bogia's "description of the

limitations in his daily activities is out of proportion to the objective findings on examinations

and the conservative nature of the treatment he has required since the back surgery." (*Id.* at 119)

The ALJ further observed that Bogia's statement that walking helped with stiffness in his back

was inconsistent with his allegation that he was unable to walk or stand for significant periods of

time due to pain from those activities. (*Id.*)

The ALJ explained that the medical records did not support the severity of pain or the

---

[2]The ALJ also found that Bogia had a personality disorder, learning disorder, and mood
disorder. (*Id.*)

degree of Bogia's limitations he alleged. (*Id.*) The ALJ walked through the treating physician

evidence, and concluded that Bogia's alleged physical pain was the main reason for his

limitations, and found that the RFC determination gave him the benefit of the doubt on his

concentration difficulties. (*Id.* at 119-20) The ALJ explained that the RFC determination was

supported by the state medical experts' RFC assessments. (*Id.* at 121 (citing *id.* at 391-97)) The

ALJ also explained that the findings of Bogia's treating physician, Dr. Kent Sallee, were

unsupported by the objective evidence, which revealed no lumbar abnormalities that would

produce the pain alleged to support severe functional restrictions, and appeared to be based on

Bogia's subjective complaints, which the ALJ found not to be credible. (*Id.* at 121) Based on

the ALJ's RFC finding, the ALJ found that there were jobs that existed in the national economy

that Bogia could perform. (*Id.* at 122-23) Accordingly, the ALJ found that Bogia was not under

a disability from June 1, 2004, through the date of his decision. (*Id.* at 123)

On March 16, 2011, the Appeals Council granted Bogia's request for review, and

remanded to the ALJ for further consideration. (*Id.* at 125-28) The Appeals Council noted that

the ALJ found that the medical evidence did not show that Bogia's use of a cane was prescribed

by a physician, but that evidence submitted on February 20, 2009 – but not considered by the

ALJ – included a prescription from Dr. Sallee dated July 4, 2007. (*Id.* at 126-27) The Appeals

Council also explained that objective evidence showed that there was enhanced scar tissue and

disk protrusion that did not result in definite nerve root impingement, and that surgery would be a

benefit, which might support Bogia's description of his limitations. (*Id.* at 127) The Appeals

Council also explained that new and material evidence suggested worsening musculoskeletal

impairments, including a residual functional capacity assessment dated August 4, 2009, and the

agency's disability finding starting November 1, 2009. (*Id.*) The Appeals Council remanded for the ALJ to reevaluate the severity and limiting effects prior to November 1, 2009, evaluate subjective complaints in accordance with disability regulations, give further consideration to Bogia's maximum RFC during the entire period, and provide rationale with references to evidence – including evaluating the treating source pursuant to regulations and social security rulings – and, finally, obtain supplemental evidence, if warranted by the record. (*Id.* at 127-28)

### 3. The Second Administrative Hearing

Bogia's second administrative hearing took place by video on February 13, 2012, with the claimant appearing in New Castle, Delaware and the ALJ presiding from Dover, Delaware. (Tr. at 18)

#### a. Plaintiff's testimony

Bogia testified that he had a number of medications that he was taking in the earlier hearing, and was still taking, but that he did not remember the names of each one. (*Id.* at 51) He explained that he had trouble concentrating due to his pain. (*Id.*) He testified that he had not worked since June 1, 2004. (*Id.* at 52)

Bogia's counsel discussed with the ALJ the surgeries that Bogia had undergone since November 1, 2009. (*Id.* at 52-53) Bogia explained that his first surgery was a lumbar hemilaminectomy, and that it resulted in his pain worsening. (*Id.* at 54-55) He explained that his injury was sustained while digging out his father's house and, thus, he did not file for worker's compensation or a personal injury lawsuit. (*Id.* at 55) He testified that he previously worked as an electrician from 1980 to 2004, and that he stopped after he had migraine headaches and a sinus operation. (*Id.* at 56-57) He explained that his major health problem was his back injury.

7

(*Id.* at 56) He also testified that he was unsure if he had been working as of June 1, 2004. (*Id.* at 57)

During questioning from his counsel, Bogia testified that he went to the hospital in 2006 from this pain, some time after the injury, and that he had an MRI in 2006. (*Id.* at 58-59) He also testified that his first surgery was in June 2008. (*Id.* at 60) He explained that he was prescribed a cane by Dr. Sallee, his primary physician. (*Id.* at 60-61) He also discussed psychiatric issues. (*Id.* at 61-62) He testified that Dr. Zhu prescribed a wheel walker for ambulation on July 17, 2009. (*Id.* at 63) He also explained that his subsequent surgeries, after November 1, 2009, were for the same pain as his first surgery. (*Id.* at 64-65)

### b. Vocational Expert's testimony

An independent VE also testified at the hearing. (*Id.* at 65, 67-75) The VE testified regarding multiple hypothetical persons. The first hypothetical person was as follows: a man who was 49 years old, with a high school education, had previously been an electrician and could read, write, and use numbers, had the ability to lift 20 pounds occasionally and 10 pounds frequently, limited ability to push and pull with lower extremities, ability to stand and walk in excess of two hours but less than six hours, and ability to sit for six hours. (*Id.* at 67-68) This hypothetical person also could occasionally stoop, crouch, crawl, squat, kneel, balance, and climb stairs, not constantly or frequently. (*Id.*) He also would have to avoid hazards, not use ladders or scaffolds, avoid dangerous heights, avoid dangerous machinery, not work around heat or cold or have concentrated exposure to heat, cold, dust, fumes, gases, and vibrations. (*Id.*) He would be capable of understanding and carrying out simple instructions, but not detailed ones due to physical pain and distractions, and would be able to do one- and two-step unskilled work as long

8

as he received breaks. (*Id.* at 68-69) Finally, this person would have to have no more that occasional contact with the general public. (*Id.* at 69)

Based on this first hypothetical, the VE explained that there were multiple positions this hypothetical person could perform that existed in the national economy, each of which were bench workers: sorter, final assembler, and final inspector. (*Id.* at 69-70)

The second hypothetical related to a person with sit/stand option, and the VE testified that each of the aforementioned positions had a sit/stand option. (*Id.* at 70)

The third hypothetical related to a person who required use of a cane. (*Id.* at 71) The VE explained that if a person had to use a cane, he would be unable to lift up to 20 pounds. (*Id.*) The ALJ asked about a person who would only need to use a cane for long distances, such as in the parking lot, rather than inside the workplace or the home. (*Id.*) The VE testified that "if a person does not necessarily need the cane or use the cane in the work place, then it would not be a relevant issue." (*Id.* at 72) The VE explained that a person limited to sedentary work under hypothetical three, with no more than two hours standing and mostly sitting, would be able to perform the positions of sedentary final assembler, sedentary unskilled inspector, and sedentary unskilled assembler, all of which exist in the national economy and region. (*Id.* at 72-73) The VE explained that this hypothetical individual would not carry more than 10 pounds due to the sedentary nature of these positions. (*Id.* at 74) Finally, the VE testified that if a person were not productive at least 80 percent of the time, it would be not be consistent with competitive employment. (*Id.* at 75)

## 4.    The ALJ's Findings

The ALJ found that Bogia met the insured status requirements of the SSA through

9

December 31, 2008, and had not engaged in substantial gainful activity since the amended alleged onset of June 24, 2008. (Tr. at 20) The ALJ found that Bogia had the following severe impairments: degenerative disc disease with radiculopathy, depression, and learning disorder. (*Id.* at 21) The ALJ found that none of these impairments or combination of impairments equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) The ALJ explained that she considered sections 1.02 and 1.04, governing musculoskeletal disorders, noting that there was no medical evidence of record that established an inability to ambulate effectively, no evidence of nerve root compression to the degree specified in sections 1.04A and 1.04B, or documented motor loss. (*Id.*) The ALJ noted that neither Bogia's representative nor any treating or examining physician suggested findings equivalent in severity to any listed impairment. (*Id.*) The ALJ found that Bogia had mild restrictions on daily living due to his physical limitations. (*Id.* at 22)[3]

The ALJ further found that Bogia had

> [t]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) that was simple and unskilled, performing one or two step tasks, with customary work breaks. He had a limited ability to push/pull with his lower extremities, could occasionally stoop, crouch, crawl, squat, kneel, balance and climb stairs, had to avoid hazards; should not do work with ladders or scaffolds, or dangerous heights, or dangerous machinery. He should have no concentrated exposure to heat or cold, dust, fumes, gases, or vibration. Lastly, he required jobs with no more than occasional contact with the general public.

---

[3]The ALJ also discussed social functioning, concentration, persistence or pace, and episodes of decompensation. (Tr. at 22) The ALJ explained that the "paragraph B" criteria were not satisfied (*id.*) and that the "paragraph C" criteria were not satisfied (*id.* at 23) The ALJ stated that the RFC assessment reflected the degree of limitation found in the "paragraph B" analysis. (*Id.*)

(*Id.*)

The ALJ found that although the impairments could reasonably be expected to cause the alleged symptoms, his statements concerning their intensity, persistence, and limiting effects were not credible. (*Id.* at 24) The ALJ explained that although clinical findings showed some limited range of motion, they showed normal strength in lower extremities, and despite records showing prescription of a cane and walker, there was no indication of significant gait disturbance, muscle atrophy, or weakness on physical examinations. (*Id.*) The ALJ then moved to addressing the newly-submitted medical evidence as directed in the Appeals Council's remand order. (*Id.*) The ALJ explained that the evidence did not show that use of an assistive device was medically necessary in spite of the prescriptions. (*Id.*) The ALJ also explained that the October 14, 2008 MRI showed enhancing scar tissue surrounding the S-1 nerve roots and persistent small posterior central disc protrustion, but no definite spinal cord or nerve root impingement. (*Id.* at 24-25 (citing *id.* at 506-07)) The ALJ explained that although Bogia showed pain, but had full strength in upper and lower extremities and sensation was intact according to Dr. Witherell's examination; although Dr. Witherell observed use of a cane, the ALJ explained that there was no indication that use of a cane was medically necessary in light of the findings of normal strength and sensation. (*Id.* at 25 (citing Tr. at 520-21))

The ALJ also discussed the opinions of Drs. Yalamanchili and Boulous in March and April 2009, each of which found that surgery was unnecessary at the time. (*Id.*) The ALJ found that although the evidence showed that surgery was eventually performed, this occurred after the period under review. (*Id.*) The ALJ discussed the new medical evidence showing a larger disc protrusion and extrusion with disc fragmentation particularly on the right. CT scans showed

11

small herniations on June 9, 2009, but scans on September 17, 2009, showed no herniation or abnormal impingement on the spinal canal. (*Id.* (citing Tr. at 541-42)) The ALJ also explained that a hospital emergency department report showed that Bogia reported chronic weakness in the legs, but that a consultation by Dr. Yalamanchili showed no evidence of focal weakness or sensory loss. (*Id.* (citing Tr. at 592-606)) The ALJ also discussed examinations from Dr. Zhu, which showed that range of motion, manual muscle testing, reflexes, and sensation in the upper and lower extremities were normal. (*Id.*; *see also id.* at 553-55) The ALJ also explained that a functional capacity evaluation conducted on February 16, 2010 was found invalid due to submaximal effort and symptom exaggeration. (*Id.* at 26 (citing *id.* at 920-23))

Discussing the opinion evidence on the physical symptoms, the ALJ examined the assessment by Brian Morrow, MSPT, at Dynamic Physical Therapy & Aquatic Rehabilitation Center on August 4, 2009. (*Id.* at 27 (citing *id.* at 527-36)) The ALJ noted that it showed a severe antalgic gait with use of a single point cane in the right upper extremity, with limitation in range of motion to 35% of normal, and reduced muscle strength. (*Id.*) The ALJ gave this opinion weight, but noted that it was not an "acceptable medical source," and ultimately found that it was inconsistent with clinical findings of normal strength. (*Id.* at 27-28) The ALJ also discussed medical certifications submitted by Drs. Boulos and Sallee. (*Id.* at 28) The ALJ found that they were not well supported by medical signs and laboratory findings, and were inconsistent with detailed, contemporaneous treatment records, in addition to noting that all were rendered prior to his lower back surgery in June 2008, which was the alleged onset date. (*Id.*) The ALJ continued to give considerable weight to the State agency RFC assessments, as they were consistent with clinical and objective findings. (*Id.*) However, the ALJ noted that certain

available evidence supported a reduction to sedentary work, rather than light work. (*Id.*)

The ALJ found that Bogia was unable to perform past relevant work as of November 1, 2009. (*Id.*) With respect to age and education, the ALJ found that Bogia was a younger individual, age 45-49, on the amended alleged onset date, and that Bogia had at least a high school education and the ability to communicate in English. (*Id.*) The ALJ found that transferability of job skills is not material. (*Id.*)

Finally, considering the age, education, work experience, and RFC, the ALJ found that jobs existed in significant numbers in the national economy that Bogia could have performed. (*Id.*) The ALJ relied upon the VE's testimony that occupations such as final assembler, inspector, and assembler existed and met Bogia's limitations, including the sedentary limitation. (*Id.* at 29-30) Accordingly, the ALJ found that Bogia was not disabled as defined by the Social Security Act. (*Id.* at 30)

## III. LEGAL STANDARDS

### A. Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining the appropriateness of summary judgment, the Court must "review the record taken as a whole . . . draw[ing] all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (internal quotation marks omitted). If the Court is able to determine that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate.

13

*See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005).

**B.      Review of the ALJ's Findings**

The Court must uphold the Commissioner's factual decisions if they are supported by

"substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Monsour Med. Ctr. v.*

*Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a

preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v.*

*Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Substantial evidence "does not mean a large or

significant amount of evidence, but rather such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the

Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh

the evidence of record. *See Monsour*, 806 F.2d at 1190-91. The Court's review is limited to the

evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95

(3d Cir. 2001). However, evidence that was not submitted to the ALJ can be considered by the

Appeals Council or the District Court as a basis for remanding the matter to the Commissioner

for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239

F.3d at 592. "Credibility determinations are the province of the ALJ and only should be

disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp.

2d 644, 657 (D. Del. 2008) (internal quotation marks omitted).

The Third Circuit has explained that a "single piece of evidence will not satisfy the

substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by

countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence,

14

particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the inquiry is not whether the Court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1983). Even if the reviewing Court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 239 F.3d at 1190-91.

## IV.   DISCUSSION

### A.   Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert,* 482 U.S. 137, 140 (1987). Title XVI of the Social Security Act provides for the payment of disability benefits to indigent persons under the SSI program. *See* 42 U.S.C. § 1382(a). A "disability" is defined for purposes of DIB as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also Barnhart v. Thomas,* 540 U.S. 20, 21-22 (2003) .

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel,* 186 F.3d 422, 427–28 (3d Cir. 1999). If a finding of disability or nondisability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of nondisability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) (mandating finding of nondisability when claimant's impairments are not severe), 416.920(a)(4)(ii). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer,* 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform his past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past

16

relevant work); *Plummer,* 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter,* 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer,* 186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer,* 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer,* 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a VE. *See id.*

**B.    Plaintiff's Argument on Appeal**

Bogia only appears to raise one argument on appeal, namely that the ALJ did not comply with the Appeals Council's Remand Order. However, Bogia's briefing also argues under this heading a second theory, which is that the ALJ erred in weighing the medical evidence in its step four analysis on Bogia's residual functional capacity, and thus the finding of no disability was incorrect.

**1.    Compliance with the Remand Order**

17

Bogia argues that the ALJ failed to comply with specific provisions of the Appeals Council's remand order. Under 42 U.S.C. § 405(g), the Court only has jurisdiction to review a "final decision of the Commissioner of Social Security." A remand order by the Appeals Council is an internal and intermediate agency-level proceeding, not a final decision of the Commissioner.

The Appeals Council issued its remand order in March 2011. On remand, the ALJ held a supplemental hearing in February 2012 and issued a decision in May 2012. Thereafter, on September 6, 2013, the Appeals Council rejected Plaintiff's objections to the ALJ's decision. Plainly, the Appeals Council had an opportunity to evaluate whether its earlier remand order was complied with by the ALJ.[4]

The Commissioner has cited to several cases for the proposition that district courts do not review compliance with remand orders. *See, e.g., Harris v. Astrue*, 2010 WL 816145, at *7 (W.D. Wash. Mar. 8, 2010); *Riddle v. Astrue*, 2009 WL 804056, at *19 (M.D. Tenn. 2009); *Bass v. Astrue*, 2008 WL 3413299, at *4 (M.D.N.C. Aug. 8, 2008); *see also Dishman v. Astrue*, 2009 WL 2823653 at *10-11 (E.D. Tenn. Aug. 27, 2009); *accord Brown v. Commissioner of Social Security*, 2009 WL 465708 (W.D. Mich. Feb. 24, 2009) (discussing agency regulations). While none of these are binding precedent on the Court, they are persuasive authority, and Plaintiff cites no contrary authority. Indeed, Plaintiff fails even to address this issue.

Accordingly, the Court cannot review the ALJ's compliance with the Remand Order.

---

[4]By agency regulations, a decision is final only after the final Appeals Council review. *See* 20 C.F.R. §§ 404.900(a)(5), 416.1400(a)(5). Further, the regulations related to action by an ALJ on remand provide that "the administrative law judge shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. § 416.1477(b).

## 2. The ALJ's Analysis of the Medical Evidence

Bogia's second argument is that the ALJ improperly weighed the medical evidence at the step four analysis. Specifically, Bogia argues that the ALJ erred by giving insufficient weight to the treating source opinions, substituting the ALJ's own judgment for that of the physicians, and disregarding the opinions without contrary medical evidence.

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (internal quotation marks and citations omitted). "Where . . . the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason." *Id.* (internal quotation marks and citation omitted). "The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled." *Id.* "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Id.* at 317-18 (internal quotation marks and citations omitted).

The ALJ's decision is supported by substantial evidence. Bogia argues that the ALJ improperly rejected Dr. Boulos's opinion from May 28, 2008 and Dr. Sallee's opinion from June 8, 2008. (D.I. 18 at 15) The weight accorded to these opinions by the ALJ was permissible, at a minimum, because of their timing, which occurred before the surgery which allegedly caused

19

Bogia's alleged disability.

Bogia also argues that the ALJ improperly rejected the opinion by Mr. Morrow from Dynamic Physical Therapy & Aquatic Rehabilitation Center. (D.I. 18 at 15-16) Under Social Security rulings and regulations, this is not an "acceptable medical source," and, accordingly, although it can be given weight in determining the severity, it cannot be used to determine existence of an impairment. *See* SSR 06-03p. The ALJ found that this opinion, that Bogia had decreased strength in his lower extremities, was inconsistent with other evidence that showed Bogia had normal strength and sensation in lower extremities. For example, a consultation by Dr. Yalamanchini on October 20, 2009, showed no evidence of focal weakness. (Tr. at 595-96) Likewise, an evaluation from Dr. Zhu on August 18, 2009 showed that Bogia had normal sensation and range of motion, and stable ambulation. (Tr. at 553-55) Based on this conflicting evidence, there is substantial evidence to support the ALJ's rejection of Mr. Morrow's opinion.

With respect to Bogia's final argument that the ALJ did not consider the degenerative nature of his disc disease, the Court finds that this contention is directed to whether the ALJ complied with the Remand Order rather than to arguing that the ALJ's findings were unsupported by substantial evidence. (D.I. 18 at 16-18) As discussed above, the Court cannot review such arguments.[5]

In sum, the ALJ's findings on all of the factual issues contested by Bogia are supported by substantial evidence in the record.

---

[5]The Court notes that treating physician evidence from October 20, 2009, near the end of the period at issue, suggested that there was no weakness in lower extremities. (Tr. at 595-96) This supports the ALJ and undercuts Bogia's argument that the disease had degenerated into a disability before November 1, 2009.

## V. CONCLUSION

For the foregoing reasons, the Court will deny Plaintiff's motion for summary judgment and grant Defendant's motion for summary judgment. An appropriate Order follows.